**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DNIGMA HOWARD, | ) | |
| | ) | 19 CV 1281 |
| Plaintiff, | ) | |
| | ) | Judge John F. Kness |
| vs. | ) | |
| | ) | |
| CITY OF CHICAGO, | ) | |
| JOHNNIE PIERRE, | ) | |
| SHERRY TRIPP, | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**THIRD AMENDED COMPLAINT**

Dnigma Howard, by and through her attorneys, Andrew M. Stroth, Carlton Odim, and Amanda S. Yarusso of Action Injury Law Group LLC, and Antonio Romanucci of Romanucci & Blandin, complains of Defendants, City of Chicago, Johnnie Pierre, and Sherry Tripp, as follows:

**Introduction**

1. This is a civil rights action, brought on behalf of Dnigma Howard, who, when she was a minor and while in attendance at a Chicago public school, was, without justification, physically abused and traumatized by two Chicago police officers.

2. On January 29, 2019, Dnigma Howard, a 16-year-old (at the time) Black female student, was punched, tasered, stepped on, struck and otherwise beaten by Defendants Pierre and Tripp, Chicago police officers, who were inappropriately and without proper recruitment, training, direction, or supervision, assigned to police minors at Marshall High School in Chicago, Illinois.

3. Dnigma Howard was also charged with misdemeanor and felony crimes as a result of Defendant-Officers Pierre and Tripp's interaction with her; these charges were subsequently

1

dismissed.

4. The City of Chicago (City), through the Chicago Police Department (CPD), and the Chicago Board of Education (Board), through Chicago Public Schools (CPS), have been assigning Chicago police officers and other security officers (School Resources Officers or SROs) at Chicago Public Schools for decades without a legal agreement between the two agencies, and without following already existing, standard best practices for law enforcement personnel in school.

5. The City and Board's lack of directives, oversight, and standards pertaining to Chicago police officers in its schools has resulted in the violation of students' civil rights and unnecessarily involved students in the criminal justice system.

6. The Defendant-Officers' use of force, arrest and criminal charging of Dnigma Howard was a direct result of the City and Board's failure to implement best practices for police and security officers in schools, practices that should be designed to ensure the safety of Chicago's children in a manner that avoids criminalizing juvenile behavior and violating their civil rights, and in a manner that ensures children, especially those with disabilities, receive a free appropriate public education as required by law.

## Jurisdiction and Venue

7. The Jurisdiction of the court is invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983 et seq.; the Judicial Code, §§ 1331 and 1343(a); and the Constitution of the United States. Venue is proper in this District under 28 U.S.C. § 1391(b). The parties reside, or, at the time the events took place, resided in this judicial district, and the events giving rise to Plaintiff's claims also occurred in this judicial district.

**Parties and Other Involved Individuals and Entities**

8. Dnigma Howard is a young Black woman and resides with her father Laurentio Howard, in Chicago, Illinois.

9. At the time of the occurrence, as alleged in this Complaint, Dnigma Howard was sixteen years old.

10. During the 2018-2019 school year, including on January 29, 2019, Dnigma Howard attended Marshall High School, in Chicago, Illinois.

11. Marshall High School is part of the Chicago Public School system administered by the Chicago Board of Education. Marshall High School staff are employees and agents of Chicago Public Schools and the Chicago Board of Education.

12. Jammie T. Poole Jr. was the principal of Marshall High School and Othiniel Mahone was the assistant principal of Marshall High School at all relevant time periods for this complaint.

13. Poole and Mahone were, at all times relevant to the allegations made in this complaint, employed by Chicago Board of Education, acting within the scope of their employment with the Board.

14. Defendants Johnnie Pierre and Sherry Tripp were Chicago police officers assigned to Marshall High School.

15. Defendants Pierre and Tripp were, at all times relevant to the allegations made in this complaint, duly appointed police officers employed by the City of Chicago, Illinois, acting within the scope of their employment with the City of Chicago and under color of state law. They are sued in their individual capacities.

16. Defendant City of Chicago is a municipality, duly incorporated under the laws of the

State of Illinois, and is the employer and principal of Defendants Pierre and Tripp. The City is responsible for the policies, practices and customs related to its maintenance of a police force.

17. Chicago Board of Education is a publicly funded agency (receiving city, state and federal funds), duly incorporated under the laws of the State of Illinois and is responsible for the governance, organizational and financial oversight of Chicago Public Schools (CPS), the third largest school district in the United States of America.

**Facts**

18. On January 29, 2019, Dnigma Howard was attending school at Marshall High School in Chicago, Illinois.

19. During the morning of January 29, 2019, Dnigma Howard was directed to leave school because of a student conduct issue, specifically having her cell phone out in class.

20. The assistant principal, Othiniel Mahone, contacted Laurentio Howard to tell him to come pick up Dnigma Howard after she had completed her final exams.

21. A school security officer then began to attempt to escort Dnigma Howard out of the school.

22. Dnigma Howard asked to speak to the assistant principal regarding completing her final exams before leaving.

23. The security officer insisted Dnigma Howard leave.

24. Dnigma Howard was not allowed to speak to the assistant principal.

25. At no time after Dnigma Howard was told to leave by Marshall High staff and prior to the Defendant-Officers initiating contact with Dnigma Howard, did Poole, Mahone, a social worker or other qualified school staff come speak to Dnigma Howard in person.

26. The security officer called Laurentio Howard and insisted that he come immediately

4

to pick up Dnigma Howard.

27. Laurentio Howard proceeded to Marshall High School.

28. At no time after Dnigma Howard was told to leave by Marshall High staff and prior to the Defendant-Officers initiating contact with Dnigma Howard, did Defendants Poole or Mahone come speak to Laurentio Howard in person.

29. The security officer maintained a physical presence, following Dnigma Howard, but did not use any physical force with Dnigma Howard

30. Defendant-Officers Pierre and Tripp then approached Dnigma Howard and began to attempt to force her to leave the school.

31. Laurentio Howard was present when Defendant-Officers Pierre and Tripp began escorting Dnigma Howard and for the events that followed.

32. Marshall High staff, including security officers, were present when Defendant-Officers Pierre and Tripp began escorting Dnigma Howard and for the events that followed.

33. Defendant-Officers Pierre and Tripp stood on either side of Dnigma Howard, surrounding her, near one of the stairways in the school.

34. After hugging a friend goodbye, Dnigma Howard turned around and took approximately two steps away from the staircase.

35. At that moment, without any cause or provocation, Defendant-Officer Pierre, an approximately two-hundred-pound adult male, violently tackled Dnigma Howard, a one-hundred-twenty-pound girl, and pulled her toward the staircase.

36. As a result of being violently tackled by Defendant-Officer Pierre, Dnigma Howard was knocked off her feet toward the top stair of a descending flight of stairs.

37. Prior to Defendant-Officer Pierre violently tackling Dnigma Howard, Dnigma

5

Howard did not make any contact with the Defendant-Officers.

38. Prior to Defendant-Officer Pierre violently tackling Dnigma Howard, Dnigma Howard did not attempt to make any contact with the Defendant-Officers.

39. Prior to Defendant-Officer Pierre violently tackling Dnigma Howard, Dnigma Howard did not threaten to make any contact with the Defendant-Officers.

40. Prior to Defendant-Officer Pierre violently tackling Dnigma Howard, Dnigma Howard did not take a swing at either of the Defendant-Officers.

41. As a result of Defendant-Officer Pierre violently tackling Dnigma Howard, Dnigma Howard fell down the stairs.

42. While Dnigma Howard was on the stairs, Defendant-Officers Tripp and Pierre escalated the use of force on Dnigma Howard.

43. Defendant-Officer Pierre dragged Dnigma Howard down the stairs by Dnigma Howard's limbs while Defendant Officer Tripp was holding onto and laying on top of Dnigma Howard's torso.

44. After reaching the bottom of the stairs, the Defendant-Officers continued to use force on Dnigma Howard.

45. After reaching the bottom of the stairs, Defendant-Officer Pierre stomped on and stood on Dnigma Howard's torso while simultaneously pulling on Dnigma Howard's arm and leg.

46. At the same time that Defendant-Officer Pierre was stepping on Dnigma Howard, Defendant-Officer Tripp forcefully pressed her arm into Dnigma Howard's neck.

47. At the same time that Defendant-Officer Pierre was stepping on Dnigma Howard, Defendant-Officer Tripp repeatedly punched Dnigma Howard in or about Dnigma Howard's

face, neck and chest.

48. After inflicting this use of force on Dnigma Howard, Defendant-Officer Pierre then proceeded to deploy his taser on Dnigma Howard.

49. During the Defendant-Officers' use of force, Dnigma Howard was prone on the ground and was surrounded by the officers and other adults including Marshall High staff and Dnigma Howard's father Laurentio Howard.

50. During the Defendant-Officers' use of force, Laurentio Howard was present and observed the incident.

51. At no time during their contact with Dnigma Howard did the Defendant-Officers request or allow Laurentio Howard to assist or intervene in escorting his daughter, Dnigma Howard, from school.

52. At no time during their contact with Dnigma Howard did the Defendant-Officers request or allow Laurentio Howard to assist or intervene in calming his daughter, Dnigma Howard, or otherwise de-escalate the situation.

53. The Defendant-Officers insisted that Laurentio Howard stay back from his daughter, Dnigma Howard, while the Defendant-Officers used force on Dnigma Howard, including punching her, deploying a taser on her, and standing/stepping on her in front of Laurentio Howard.

54. At no time during their contact with Dnigma Howard did the Defendant-Officers seek assistance or involvement from any Marshall administration, staff members, or other security officers in escorting Dnigma Howard.

55. At no time during their contact with Dnigma Howard did the Defendant-Officers attempt to deescalate the interaction.

56. While the Defendant-Officers were using force on Dnigma Howard, Dnigma Howard, who suffers from asthma, was having trouble breathing.

57. As a result of the incident and the Defendant-Officers' use of force, Dnigma Howard was injured and was brought to a hospital for treatment.

58. After their arrest and use of force on Dnigma Howard, the Defendant-Officers made deliberately false statements about the incident.

59. The Defendant-Officers falsely claimed that Dnigma Howard took a swing at Defendant-Officer Pierre, necessitating their use of force.

60. The Defendant-Officers made these false statements to other officers responding to the scene.

61. These false statements were recorded on officers' body cameras.

62. The Defendant-Officers made similar false statements in the police reports, alleging that Dnigma Howard became irate and initiated a physical altercation with the officers.

63. The false statements in the police reports are contradicted by school surveillance video footage.

64. Surveillance video footage of the Marshall High School stairs shows that Defendant-Officer Pierre violently tackled Dnigma Howard without cause or provocation.

65. Surveillance video footage of the Marshall High School stairs shows that Dnigma Howard did not take a swing at Defendant-Officer Pierre before he violently tackled her.

66. Surveillance video footage of the Marshall High School stairs shows that Dnigma Howard did not initiate a physical altercation with the officers.

67. Surveillance video footage of the Marshall High School door/entry area shows Defendant-Officer Pierre stepping on Dnigma Howard.

68. Surveillance video footage of the Marshall High School door/entry area shows Defendant-Officer Pierre dragging Dnigma Howard down the stairs, by her limbs.

69. Surveillance video footage of the Marshall High School door/entry area shows Defendant-Officer Pierre dragging Dnigma Howard down the stairs, by her limbs, while Defendant-Officer Tripp is on top of Dnigma Howard.

70. Surveillance video footage of the Marshall High School door/entry area shows Defendant-Officer Tripp pushing her arm and/or hand into Dnigma Howard's neck.

71. Surveillance video footage of the Marshall High School door/entry area shows Defendant-Officer Tripp repeatedly punching Dnigma Howard in or about Dnigma Howard's face, neck and chest.

72. Surveillance video footage of the Marshall High School door/entry area shows Defendant-Officer Pierre deploying his taser on Dnigma Howard while she is prone on the ground surrounded by two police officers, school security staff, other school staff and Dnigma Howard's father.

73. Surveillance video footage from Marshall High School clearly shows that the Defendant-Officers initiated violent contact with Dnigma Howard, escalated the situation through their continued use of force, and falsely accused Dnigma Howard of assaulting and battering them when she was actually defending herself from the officers' vicious and unwarranted attack.

74. As a result of the incident, Dnigma Howard was charged with misdemeanor and felony charges that were initiated by the Defendant-Officers.

75. These charges were based on the Defendant-Officers' false version of events designed to justify their excessive use of force.

76. While the criminal charges were pending, Dnigma Howard was confined to her home on an electronic monitoring device and was not allowed to attend school or enjoy other daily activities and freedom of movement.

77. The charges were dismissed in the interests of justice by the Cook County State's Attorney on February 6, 2019.

78. As a result of the incident, Dnigma Howard had to leave Marshall High School and her community of friends and supporters and enroll in a different CPS high school.

79. Throughout her enrollment at Marshall High School, including on January 29, 2019, Dnigma Howard had an Individual Education Program (IEP) based on an emotional disability.

80. The IEP included a Behavior Intervention Plan (BIP).

81. All school staff that interact with Dnigma Howard were to have received a copy of the BIP for Dnigma Howard.

82. It is the responsibility of all school staff that interact with Dnigma Howard to implement the BIP for Dnigma Howard.

83. The IEP/BIP for Dnigma Howard specified that Dnigma Howard has difficulty regulating her emotions and is defensive when confronted.

84. The IEP/BIP for Dnigma Howard noted that removal from the classroom, engagement of police or security, and suspensions have not been successful in addressing Dnigma Howard's behavioral issues and emotional disability.

85. Further, the IEP/BIP noted that removal from school and suspensions are negatively affecting Dnigma Howard's academic performance.

86. The IEP/BIP specified that school staff shall use the CPS Student Code of Conduct to address Dnigma Howard's emotional disability and behavioral issues.

87. The IEP/BIP specified planned non-restrictive interventions for instances in which Dnigma Howard needed to be removed from a classroom setting or other instances when situations arose requiring discipline, redirection, or behavior issues.

88. Marshall High School staff, including Poole and Mahone, did not properly follow the Student Code of Conduct on January 29, 2019, to address the underlying behavioral issue.

89. Defendant-Officers Pierre and Tripp did not properly follow the Student Code of Conduct on January 29, 2019, to address the underlying behavioral issue.

90. Defendant-Officers Pierre and Tripp did not properly follow Dnigma Howard's IEP/BIP on January 29, 2019, to address the underlying behavioral issue.

91. The Defendant-Officers unnecessarily intervened and escalated a student behavioral issue when they approached Dnigma Howard and forcibly attempted to remove her from school.

92. The Defendant-Officers initiated contact with Dnigma Howard in contravention of nationally accepted best practices, Dnigma Howard's IEP/BIP, and the CPS Student Code of Conduct.

93. The Defendant-Officers unreasonably and excessively seized and used force on Dnigma Howard to address a student behavioral issue.

94. The Defendant-Officers instigated and escalated a violent confrontation when they violently seized Dnigma Howard without provocation and then proceeded to drag her down the stairs, step on her chest, punch her in the face, and deploy a taser on her.

95. The Defendant-Officers' conduct escalated a student behavioral issue into an incident that resulted in felony charges against Dnigma Howard

96. As a result of the Defendants' conduct as described above, Dnigma Howard has suffered injuries in the form of pain and suffering, loss of freedom, and emotional trauma and

distress.

## Count I
## 42 U.S.C. § 1983 Claim for Unconstitutional Seizure

97. Plaintiff repeats and realleges the preceding paragraphs of this Complaint, as if they were fully set out in this Count.

98. The actions of Defendant Officers Pierre and Tripp, in physically approaching, seizing, escorting and using any force on Dnigma Howard, over a student behavioral issue, violated Dnigma Howard's rights under the Fourth Amendment to the United States Constitution to be secure in her person against unreasonable seizure, and caused the injuries alleged in this complaint.

99. The actions of the Defendant Officers, as alleged in this Complaint, were the direct and proximate cause of the constitutional violations set forth above and of Dnigma Howard's injuries.

WHEREFORE, pursuant to 42 U.S.C. §1983, Plaintiff demands compensatory and punitive damages against Defendant-Officers Pierre and Tripp, plus the costs of this action, attorneys' fees, and whatever additional relief this Court deems equitable and just.

## Count II
## 42 U.S.C. § 1983 Claim for Excessive Force

100. Plaintiff repeats and realleges the preceding paragraphs of this Complaint, as if they were fully set out in this Count.

101. The actions of Defendant-Officers Pierre and Tripp, in grabbing, tackling, pushing, punching, choking, deploying a taser, stepping/standing on Dnigma Howard, and otherwise using force on Dnigma Howard, violated Dnigma Howard's rights under the Fourth Amendment to the United States Constitution to be secure in her person against unreasonable

seizure in the form of excessive force, and caused the injuries alleged in this Complaint.

102. The actions of the Defendant Officers, as alleged in this Complaint, were the direct and proximate cause of the constitutional violations set forth above and of Dnigma Howard's injuries.

WHEREFORE, pursuant to 42 U.S.C. §1983, Plaintiff demands compensatory and punitive damages against Defendant-Officers Pierre and Tripp, plus the costs of this action, attorneys' fees, and whatever additional relief this Court deems equitable and just.

### Count III
### 42 U.S.C. § 1983 *Monell* Policy Claim Against Defendant City of Chicago

103. Plaintiff repeats and realleges the preceding paragraphs of this Complaint, as if they were fully set out in this Count.

104. The City of Chicago, through the Chicago Police Department (CPD), employs police officers and security officers assigned in various schools throughout Chicago.

105. These police officers and security officers interact with Chicago's children on a daily basis in communities all over the City of Chicago.

106. Police officers dealing with youth on a regular basis, such as in schools, require specialized training.

107. Numerous examples and guides for best practices for law enforcement presence in schools, nationwide, are readily available.

108. One example of these best practices is the SECURe Local Implementation Rubric designed by the U.S. Departments of Education and Justice in 2016.

109. Despite this, on January 29, 2019, the City/CPD did not have an intergovernmental agreement with the Board/CPS that governs the recruitment, selection,

placement, training, roles, and responsibilities of Chicago police officers in Chicago schools.

110. The City and its police department lack any formal recruitment, selection, and placement processes and standards to ensure that police officers assigned to schools are proper candidates for these unique positions.

111. Furthermore, the City and CPD do not provide specific training for police officers assigned to schools on unique aspects that are essential to their role, most importantly alternatives to arresting students and using physical force on students.

112. In addition to alternatives to arrest and use of force, such training should include topics specifically relevant to officers (police and/or security) interacting with young students, such as:

    a. Childhood and adolescent development;

    b. Age-appropriate response to student conduct;

    c. Disability and special education issues;

    d. Conflict resolution and de-escalation techniques;

    e. Responses to trauma;

    f. Restorative justice techniques; and

    g. Interacting with specific student groups, such as ESL learners and LGBTQI students.

113. These above deficiencies have been found to exist by the City of Chicago's Office of Inspector General and acknowledged by CPD as reported in the OIG's <u>Review of the Chicago Police Department's Management of School Resource Officers</u> (OIG Review), which can be found at https://igchicago.org/wp-content/uploads/2018/09/CPD-Management-of-School-Resource-Officers-Review.pdf.

114. CPS's own Student Code of Conduct dictates that school administrators should only contact CPD in the event of criminal activity and emergencies and additionally provides a list of factors to consider before involving CPD in any matter. See (at p. 11-12): https://cps.edu/SiteCollectionDocuments/SCC_StudentCodeConduct_English.pdf

115. Despite this written policy, it is the practice of police officers assigned to Chicago schools to become involved in non-criminal student behavior matters and other non-criminal incidents.

116. The written policy regarding the Student Code of Conduct is not being communicated to officers in schools; according to the OIG Review: "CPS last conducted training for all SROs [i.e. police officers] on its revised Student Code of Conduct in 2013." Furthermore, the Student Code of Conduct lacks any specific guidance for SROs on their roles and responsibilities.

117. Furthermore, Defendant City's written policies for police officers assigned to schools are woefully inadequate. The OIG review found that: "Neither CPD nor CPS has written roles or responsibilities for SROs [i.e. officers in schools]."

118. Officers in schools are not evaluated by CPD in a way that includes their unique roles and responsibilities as SROs; they are evaluated under the same rubric as police officers on the street. Neither CPS nor the Board evaluates officers in schools or their performance. (See OIG Review and Report, p. 10-11.)

119. As a result of the September 13, 2018, OIG Review, the City of Chicago was put on notice that "[to] protect and serve students, it is vital that CPD make *immediate* changes to ensure the safe and productive engagement of SROs with students and their families."

120. The recently ordered Consent Decree, in order to correct these undisputed serious

deficiencies, requires that officers assigned to work in CPS schools be appropriately vetted, trained, and guided by clear policy in order to cultivate relationships of mutual respect and understanding, and foster a safe, supportive and positive learning environment for students. See (at ¶ 38): http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/02/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf

121. Such specialized training must include: the use of de-escalation techniques, restorative approaches, community resources and alternative response options, youth development, crisis intervention, and disability and special education issues, among other things (at ¶ 42).

122. The Consent Decree's requirements regarding officers assigned to CPS schools stemmed from the Department of Justice's findings that "CPD's pattern or practice of excessive force also includes subjecting children to force for non-criminal conduct and minor violations." *January 13, 2017 DOJ Report: Investigation of the Chicago Police Department*, at p. 34 (found at https://www.justice.gov/opa/file/925846/download).

    a. In one incident, that is strikingly similar to what occurred to Dnigma Howard, "officers hit a 16-year-old girl with a baton and then Tasered her after she was asked to leave the school for having a cell phone in violation of school rules. Officers were called in to arrest her for trespassing. Officers claimed the force was justified because she flailed her arms when they tried to arrest her, with no adequate explanation for how such flailing met the criteria for use of a Taser. This was not an isolated incident."

    b. "[The DOJ] also reviewed incidents in which officers unnecessarily drive-stunned students to break up fights, including one use of a Taser in drive-stun

mode against a 14-year-old girl. There was no indication in these files that these students' conduct warranted use of the Taser instead of a less serious application of force."

c. "[The DOJ] also found instances in which force was used against children in a retaliatory manner." The Report describes numerous examples of gratuitous, sadistic force and threats of force on young school children by officers on the street. (DOJ Report at p. 34-35.)

d. The DOJ found that these instances of misconduct were not adequately investigated, citing by example this incident: "[I]n one investigation of a complaint of misconduct, an IPRA investigator interviewed an 8-year-old girl who complained that a CPD officer working secondary employment in a school grabbed the girl by her hair, swung her around, and choked her while breaking up a fight in a school hallway. IPRA did not interview the identified student witnesses and entered a non-sustained finding based primarily on the accused officer's written statement." (DOJ Report at p. 59.)

123. Other studies by reputable sources reveal that the abuse Dnigma Howard suffered was not an isolated incident. The following examples and data come from a comprehensive report by the Shriver Center, <u>Handcuffs in Hallways: The State of Policing in Chicago Public Schools</u> (February 2017).

a. In September 2010, at Crane High School, two male officers pushed a Black female student to the floor and kneeled on the students neck and shoulder. She was handcuffed and arrested. The City paid $100,000 in 2014 to settle the case.

17

    b. At Hyde Park Academy, an officer handcuffed a young Black female student to another student and struck the same student in the face. The City settled this case and the officer admitted to striking the student in his response to the IPRA complaint regarding the incident. This officer had accumulated eight complaint files, four of which were for excessive force, and continued to work at the school.

    c. In total, between 2012 and 2016, police officers assigned to CPS cost the City and its citizens over $2 million in misconduct settlements for activities on and off school grounds, with $1.5 million of that total resulting from excessive force against a minor.

    d. CPS students with disabilities have been disproportionately referred and/or arrested by law enforcement.

124. These deficiencies in City of Chicago's policies regarding recruitment, assignment, roles, duties, training, and guidelines for police and security officers in Chicago schools created an environment where CPD officers and CPS staff treat student conflicts and behavioral issues as violent, criminal situations, and thereby caused the individual Defendant-Officers' violation of Dnigma Howard's rights.

125. Moreover, the failure to adhere to the minimal policies and standards already in place by CPS and CPD also caused the individual Defendant-Officers' violation of Dnigma Howard's rights and the Marshall High School staff's conduct described in the Complaint.

WHEREFORE, pursuant to 42 U.S.C. § 1983, Plaintiff demands substantial actual or compensatory damages against the City of Chicago, plus the costs of this action, attorneys' fees and whatever additional relief this Court deems equitable and just.

## Count IV
## State Law Claim for Battery

126. Plaintiff repeats and realleges the preceding paragraphs of this Complaint, as if they were fully set out in this Count.

127. The Defendant-Officers, knowingly and without legal justification caused bodily harm to Dnigma Howard, when they pushed, punched, tasered and stepped on her, thereby constituting battery under Illinois law.

WHEREFORE, Plaintiff demands substantial actual or compensatory damages against Defendant-Officers Pierre and Tripp, and, because Defendant-Officers acted maliciously, wantonly, or oppressively, Plaintiff demands punitive damages, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## Count V
## State Law Claim for *Respondeat Superior* Against Defendant City of Chicago

128. Plaintiff repeats and realleges the preceding paragraphs of this Complaint, as if they were fully set out in this Count.

129. The Defendant-Officers were, at all times material to the allegations made in this complaint, employees and agents of the City of Chicago, acting within the scope of their employment. Defendant City of Chicago is liable for the acts of the Defendant-Officers that form the basis for Plaintiff's state law claim under the doctrine of *respondeat superior*.

WHEREFORE, Plaintiff demands judgment for compensatory damages, jointly and severally from Defendant City of Chicago, plus the costs of this action and whatever additional relief this Court deems equitable and just.

## Count VI
## 745 ILCS 10/9-102 Claim Against Defendant City of Chicago

130. Plaintiff repeats and realleges the preceding paragraphs of this Complaint, as if they were fully set out in this Count.

131. Defendant City of Chicago was the employer of the Defendant-Officers at all times relevant to the allegations contained in this complaint.

132. The Defendant-Officers committed the acts alleged in this Complaint in the scope of their employment as employees of the Defendant City of Chicago, and Defendant City of Chicago is liable for their actions under 745 ILCS 10/9-102.

WHEREFORE, Plaintiff requests this Court order the Defendant City of Chicago to indemnify the individual Defendants for any compensatory damages and attorneys' fees and costs awarded to Plaintiff against said individual Defendants.

Respectfully submitted,

/s/Amanda Yarusso

Andrew Stroth
Carlton Odim
Amanda Yarusso
ACTION INJURY LAW GROUP
191 N. Wacker Drive, Suite 2300
Chicago, Illinois 60606
(312) 578-9390

Antonio M. Romanucci
ROMANUCCI & BLANDIN, LLC
321 N. Clark Street, Suite 900
Chicago, Illinois 60654
(312) 458-1000